**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

SHIRLEY L. PHELPS-ROPER, et al.,      )
                                      )
                Plaintiffs,           )
                                      )
        v.                            )        No. 4:09-CV-1298-CDP
                                      )
CITY OF MANCHESTER, MISSOURI,         )
                                      )
                Defendant.            )

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

**A.      Plaintiffs Emphasize Subjective Effect Of Ordinance And Cite No Evidence Of**
**         Objectively Reasonable Chilling Necessary To Establish Standing.**

        The response of Plaintiffs Shirley and Megan Phelps-Roper to Defendant City of

Manchester's argument that they lack standing to challenge any of the three versions of

municipal ordinance § 210.264 is their oft-repeated assertion that they were chilled by the

presence of the ordinances from protesting in Manchester.  Even if the Court accepts these

conclusory claims as evidence of Plaintiffs' subjective state of mind, their subjective beliefs are

immaterial.  The key question before the Court in determining whether the Plaintiffs have

standing to launch a highly disfavored[1] facial challenge to the Manchester ordinance is whether

Plaintiffs are *objectively reasonably* chilled by the ordinances.[2]  Plaintiffs' efforts to outweigh the

substantial objective evidence that they were not (and are not) chilled by the ordinance with

conclusory subjective claims should be rejected.

        In its Memorandum in Support, Manchester set forth considerable evidence that Plaintiffs

---

[1] Plaintiffs do not dispute to Manchester's citation of very recent Supreme Court authority (as recent as 2008) illustrating the disfavor in which facial constitutional challenges are held, except to cite older authority in the form of a 1988 Supreme Court decision.

[2] *Republican Party of Minnesota, Third Congressional District v. Klobuchar*, 381 F.3d 785, 792 (8th Cir. 2004)

have not been objectively chilled by the ordinance in any of its three versions.  Plaintiffs' efforts

to refute this evidence are wholly ineffective.  At the outset, it is incontestable that Manchester's

ordinance could have had no immediate impact on Plaintiffs because they were not aware of its

passage in March, 2007.  Plaintiffs nevertheless attempt to contradict the unequivocal testimony

from their own depositions that they both first learned of the Manchester ordinance in January,

2009, almost two years after it was enacted.  Shirley Phelps-Roper testified as follows:

```
 8      Q   Now, you learned of the adoption of the original
 9  ordinance by Manchester at some point after it passed?
10      A   Yes.
11      Q   Do you have any recollection as far as when that
12  might be?
13      A   I have to believe it was about the time when I
14  learned that God sent the shooter, when you got these
15  people that just have these adulteries everywhere, and
16  jealousy being the rage of a man, so sayeth our God, that
17  guy ends up killing the woman.  He killed the woman and he
18  killed himself.
19      Q   You're talking about Frank Kavano killing?
20      A   It was in January of '09.  It was about a year
21  ago.[3]
```

Shirley Phelps-Roper's testimony on when she learned of the Manchester ordinance could not be

clearer.  It was in January, 2009, and tied to a specific event in her memory.  Plaintiffs' attempt to

claim that Ms. Phelps-Roper was not saying when she *first* learned of the ordinance is

completely refuted by the plain language of her testimony.

     If the express, unconditional testimony from one Plaintiff is not enough to establish that

Plaintiffs did not learn of Manchester's ordinance until January, 2009, consider the identical

testimony of Megan Phelps-Roper:

```
14      Q   When did you learn of Manchester adopting, what
15  I call the original ordinance?  Do you understand what I
16  mean by that?
17      A   Uh-huh, yes, I do.
```

---

[3] Deposition of Shirley Phelps-Roper (SPR Dep.), attached to Mem. in Supp. as Exhibit C-1, p. 27

```
18      Q   When did you learn about that?
19      A   It was about a year ago.  It was around the time
20   of my birthday, that's how I remember.  My birthday is the
21   last day of this month.  And we -- I think actually I was
22   the one who heard of that, the God send the shooter event,
23   the one with Frank -- Frank the plumber, and all of his
24   adultery and his wife's adultery, and so when we realized
25   that we couldn't go because of that ordinance, we didn't
1    even consider it.[4]
```

The testimony of Plaintiffs when they learned of the Manchester ordinance is absolutely clear. Manchester was of so little importance to Plaintiffs that nearly two years passed before they learned that this little municipality on the far side of a different state had passed a funeral protest ordinance.  Eight more months passed before Shirley Phelps-Roper filed her initial cookie-cutter lawsuit with its false claim of having protested in Manchester previously in an apparent bid for standing.[5]  Seen objectively, this evidence establishes that the Manchester ordinance had no negative effect on Plaintiffs, even when they belatedly learned of its existence.

Plaintiffs try to deploy an affidavit from a Rachel Hockenbarger stating that, maybe, possibly, she told Plaintiffs of the Manchester ordinance at some unspecified point before January, 2009.  This highly imprecise testimony means nothing when placed in the balance against Plaintiffs' own extremely specific statements regarding when they learned of the Manchester ordinance.  Ms. Hockenbarger's affidavit has no probative value.

Plaintiffs concede the crucial fact that they do not know of a single funeral that occurred in Manchester since the passage of the original version of the ordinance at which they might have wanted to protest.[6]  However, they continue their effort to claim that their conduct with respect to the Kavano murder-suicide in early 2009 is somehow objective evidence of chilling. The objective record proves that Plaintiffs were not chilled from protesting in 2009 by the

---

[4] Deposition of Megan Phelps-Roper (MPR Dep.), attached to Mem. in Supp. as Exhibit D, pp. 7-8
[5] See Manchester's Memorandum in Support, p. 7 n.24, n.25
[6] Plaintiffs' Memorandum in Opposition, p. 2 ¶ 2

Manchester ordinance because they had no actual intent of protesting at those funerals (which didn't occur in Manchester in any event).  If they had had an intent, they would have sent a letter to local law enforcement, which Shirley Phelps-Roper testified occurs if Westboro members are even thinking about holding a protest at a location.[7]  No communication of any kind occurred with anyone in Manchester with respect to protesting at the Kavano funerals (which were not held in Manchester in any event), not even a telephone call.[8]  Thus, there is no objective evidence that Plaintiffs had any intention of protesting in Manchester with respect to the Kavano matter, and so they could not have been objectively chilled by learning about the ordinance.

Moreover, even if Plaintiffs were somehow subjectively chilled by learning of the Manchester ordinance in conjunction with the Kavano affair, the claim of chilling is not objectively reasonable given their prior record of protesting in Missouri.  Plaintiffs had, by their own admission, protested at least nineteen times in Missouri while the state funeral statute was still in effect.[9]  Plaintiffs contend that they also were forced to terminate plans for several protests in Missouri based on opposition from local officials.  Even if true, that fact would have no objective significance with respect to protesting in Manchester, where there was no contact with local officials that could have affected Plaintiffs' claimed plans to hold a protest.

In their Memorandum in Opposition, Plaintiffs assert that the mere fact that Manchester had gone to the trouble of passing the funeral ordinance was enough to chill them in 2009.  This claim, too, is not objectively reasonable evidence of chilling because Plaintiffs show no reasonable basis for their subjective decision.  Plaintiffs point to no negative experience with even a single municipality that had passed its own funeral protest legislation that would make

---

[7] SPR Dep., pp. 30, 58
[8] *Id.*, pp. 29-30
[9] *Id.*, Ex. 3, attached to Manchester's Mem. in Supp. at Ex. C-2, Plaintiff's Responses to First Interrogatories Directed to Shirley Phelps-Roper, ¶¶ 1-2 (listing Missouri protests)

their supposed revulsion to Manchester on that basis objectively reasonable.  Quite to the contrary, Westboro Baptist Church members had protested in Kansas City (twice, including Plaintiffs both times) and in Ballwin while both the state statute and locally passed funeral ordinances were in effect.[10]   Nowhere in the record do Plaintiffs cite even a single example of another protest that was scuttled solely because they learned that the municipality had passed a funeral protest ordinance.  Thus, even if Plaintiffs decided suddenly and arbitrarily not to hold funeral protests in municipalities with ordinances—like Manchester—that decision was based on subjective factors entirely peculiar to Plaintiffs and not on any objectively reasonable basis.

Plaintiffs also contend that the fact that the Kavano funerals were not actually held in Manchester is of no moment.[11]   In essence, they urge the court to find that they were objectively reasonably chilled by the mere fact that Manchester had a funeral ordinance, despite the fact that this claim of chilling is belied by Plaintiffs' prior protesting activities and despite the fact that this "full stop" response to the presence of a funeral ordinance is contrary to their earlier actions when faced with an ordinance.  In those instances, they either protested, as discussed above, or they found out where the funeral was actually taking place and then carried out a protest.[12]

Here, had they followed the same course, they would have learned that the Kavano funerals were taking place in Affton and in Perry County, not in Manchester.  Plaintiffs' claimed decision to stop all planning for a Kavano-related protest after learning of the Manchester ordinance can only be interpreted as (1) evidence that they had no intention of ever protesting at a Kavano funeral for reasons unconnected to the ordinance, or (2) that Plaintiffs, for an entirely

---

[10] Plaintiffs' Mem. in Opp., p. 3 ¶ 6
[11] This fact was established by affidavits, and is uncontested by Plaintiffs.  In a strange aside, Plaintiffs state "[t]ellingly, all of Defendant's evidence that the funeral activities took place outside of Manchester is contained in affidavits executed in February 2010."  The significance of the date of the affidavits is not explained.  Given that the Plaintiffs' Kavano-related claims were (tellingly) not made in the Complaint, First Amended Complaint, or Second Amended Complaint, it makes sense that Manchester would not obtain the affidavits until after Plaintiffs' depositions were taken in January, 2010, wherein they denied knowledge of the actual location of the funerals.
[12] SPR Dep., pp. 29, 37-38

personal reason that was objectively unreasonable, decided to jettison all their past practices and ignore their prior experiences and give overriding significance to the presence of a funeral protest ordinance.  Either way, Plaintiffs' actions with respect to the Kavano funerals is not objectively reasonable evidence of chilling and cannot serve as the basis for standing.

In moving for summary judgment on Count III of the Second Amended Complaint— which challenges the current version of the ordinance—Manchester showed that the chances of Plaintiffs ever protesting at a funeral in the municipality were so remote due to the contingencies involved that Plaintiffs could not show that they had been objectively reasonably chilled from protesting.  Manchester cited to *Nor-West Cable Communications Partnership v. City of St. Paul*,[13] which emphasized the need for plaintiffs to be in a functional position to actually be subjected to the effect of an a ordinance in order to maintain a challenge to it.

In response, the Plaintiffs (while ignoring *Nor-West Cable* entirely) claim that "[t]he type of expression in which Plaintiffs engage is not compatible with the type of proof Manchester urges this Court to demand."  First, this allegation ignores the logistical problems that Plaintiffs would face in mounting a protest in Manchester should the opportunity ever arise, which Shirley Phelps-Roper testified to.[14]  This is precisely the point that concerned the Eighth Circuit in *Nor-West Cable*.  Plaintiffs' only response is to say, without citation to any support in the record, that "[t]he logistical challenges that would prevent Plaintiffs from traveling to Manchester are not great . . ."[15]  Notably, Plaintiffs' first deposition date in this action was postponed because of their inability to travel due to bad weather.[16]  In light of this real-world experience, Plaintiffs' newly-professed nonchalance concerning the difficulties they routinely face when trying to

---

[13] 924 F.2d 741, 749 (1991)
[14] SPR Dep., pp. 15, 17
[15] Plaintiffs' Mem. in Opp., p. 8
[16] SPR Dep., p. 99

mount a protest is singularly unpersuasive.

Second, Plaintiffs' emphasis on the naturally contingent nature of funerals as an excuse for not having the evidence necessary to establish standing is misplaced.  Indeed, it is contingent nature of funerals that helps to defeat Plaintiffs' facial challenge, because this Court does not know when or even if Plaintiffs will ever be in a position to be subject to enforcement of the ordinance.  It must be emphasized that Plaintiffs do not have an indefeasible right to bring a facial challenge, and they do not gain such a right simply because they often protest at funerals, which might occur at any time.  Just like any other litigant, Plaintiffs must satisfy Article III standing requirements and must also overcome the disfavor in which facial constitutional challenges are held before this Court can even reach the merits of their claim.  They receive no excuse from these constitutional requirements due to their particular fondness for protesting at funerals, and they cite no authority to suggest otherwise.

If the concrete evidence of planning that is essential to prove standing for a facial constitutional challenge is unavailable to Plaintiffs due to the contingent nature of funerals, that does not deprive Plaintiffs of a remedy in the event that they are faced with an actual or threatened injury associated with the Manchester ordinance.  Under the Federal Rules of Civil Procedure, this court is always open to provide relief if it is needed.[17]  If a funeral is to occur in Manchester at which Plaintiffs wish to protest and at which they are demonstrably able to protest and they are unable to come to an agreement with local officials and feel chilled as a consequence, they presumably can try to bring an "as applied" challenge to the ordinance and seek emergency injunctive relief.  However, the mere fact that a funeral might eventually occur in Manchester at which the Plaintiffs might want to protest—if all the circumstances align—

---

[17] Fed.R.Civ.P. 77(a)

does not meet the very strict requirements for bringing a facial constitutional challenge.[18]

Interestingly, Plaintiffs have placed no facts in the record that any funerals have actually been held in Manchester since March, 2007.  Similarly, they have placed no facts in the record that any venue exists in Manchester at which funerals are held at all, let alone with any regularity.  The most that Plaintiffs can point to is that they saw a steeple while they were protesting at City Hall in Manchester, with no proof that the steeple actually evidenced a functioning church that holds funerals, or that the (presumed) church to which the steeple was attached was actually within the municipal boundaries of Manchester.[19]  While Manchester certainly does concede that religious institutions are located within its boundaries at which funerals can presumably be held, the fact that Plaintiffs have offered no evidence regarding how many funerals occur in Manchester or how often simply shows how disconnected they are from the municipality and how remote the chances are that they will ever seek to protest at a funeral there.  Plaintiffs have no basis to claim standing in their challenge to the current ordinance.

**B.     Plaintiffs Are Collaterally Estopped From Challenging The Current Ordinance.**

Plaintiffs cite three reasons why they are not collaterally estopped from challenging the current version of Manchester's ordinance despite that fact that Shirley Phelps-Roper, on behalf of fellow church members including daughter Megan, brought and lost a suit to challenge the same provisions that are contained in the current ordinance as they were originally set forth in an Ohio statute.[20]  None of these reasons are persuasive.

First, Plaintiffs contend that the Eighth Circuit rejected the Sixth Circuit's holding in *Phelps-Roper v. Strickland* and that this supposed rejection bars the application of issue

---

[18] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)
[19] Plaintiffs' Mem. in Opp., p. 2 ¶ 3
[20] *Phelps-Roper v. Strickland*, 539 F.3d 356 (6th Cir. 2008)

preclusion against them here.[21]   It must be established at the outset, only the Sixth Circuit has decided the present issues on the merits.   In *Phelps-Roper v. Nixon*, the Eighth Circuit was considering a request to issue a preliminary injunction against entirely dissimilar legislative language.[22]   The panel did not reject *Strickland*, it merely relied on an (immediately distinguishable) Eighth Circuit case in concluding that Phelps-Roper had met the burden to obtain an injunction.[23]   Indeed, the panel did not even consider the reasoning in *Strickland*, nor did it cite to, let alone distinguish, the Supreme Court's forceful recognition in *Nat'l Archives & Records Admin. v. Favish*[24] of the longstanding rights of those mourning family members.   The fact that a panel of the Eighth Circuit has made preliminary observations in another case does not trump the preclusive effect of a decision on the merits by another federal court of appeals.[25]

Second, Plaintiffs contend that the legal issues and evidence are significantly different in this case, chiefly because they assert that content-neutrality was not an issue in the Ohio litigation but is here.   In this regard, Plaintiffs claim that the fact that the Ohio statute was older while the present ordinance is of more recent vintage somehow requires that they be treated differently in deciding a facial constitutional challenge.[26]   This is another effort by Plaintiffs to claim that they are the "inspiration" for the Manchester ordinance and therefore are entitled to

---

[21] Even if the premise were true and the Eighth Circuit had "rejected" *Strickland*, Manchester has brought the apparently novel affirmative defense that as a corporate entity and thus a person, it cannot be treated differently than Ohio simply because the two happen to exist in different Circuits.  The idea of "circuit splits" has been accepted without consideration of the equal protection violations that are inherent in allowing citizens to be subjected to disparate treatment due to the dueling interpretations of different Circuit Courts of Appeal on the same issues of law. This issue is not ripe at this level, because this Court is not bound by the preliminary and distinguishable *Nixon* decision in any event, but Manchester does not waive this defense should this case be heard by the Eighth Circuit.

[22] 545 F.3d 685, 688-89 (8th Cir. 2008)

[23] *Id.* at 691-92

[24] 541 U.S. 157, 160 (2004)

[25] *Nixon* may also be questionable following the very recent decision of the Supreme Court to grant cert. in *Snyder v. Phelps*, 580 F.3d 206 (4th Cir. 2009), http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/09-751.htm, including the question of whether a state has the power to enact limits on speech to protect mourners at funerals from unwanted communication.

[26] Plaintiffs' premise regarding the comparatively venerable status of the Ohio statute is wrong.  It underwent a "major expansion" in 2006.  *Strickland*, 539 F.3d at 358

some special treatment by the Court, a position for which they provide no support.[27]   If the language of the Ohio statute was content-neutral for purposes of a facial constitutional challenge, it is also content neutral as it appears in Manchester's ordinance.

Plaintiffs also contend that Manchester is required to provide objective evidence showing that the restrictions serve the interests asserted.  Here, the Supreme Court and the Sixth Circuit have already found as a matter of law that mourners are a special class deserving of protection from unwanted intrusions on their privacy.  This is addressed more fully in Section D, below.

Third, Plaintiffs contend that Megan Phelps-Roper is not precluded by the *Strickland* case because she was not a named party in that case.  Plaintiffs do not contest the evidence that Shirley Phelps-Roper was attempting to vindicate not just her rights in the *Strickland* case, but those of her fellow church members, including her daughter, Megan.  Shirley Phelps-Roper stipulated as to the contents of the church's website and answered discovery inquiries regarding the activities of the church and its other members, just as she did here.  Her entire lawsuit in *Strickland*, as here, was based on the group activities of the church as compelled by the group beliefs of the church members.  Clearly, the *Strickland* lawsuit was brought on behalf of a very small group, including Megan Phelps-Roper, and she is subject to the preclusive effect of *Strickland* just as her mother is.  To rule otherwise is to invite serial lawsuits by closely related persons on the same issue as a harassing tactic.

## C.    The Current Ordinance Is Content-Neutral, As Plaintiffs Concede.

As noted above, Plaintiffs attempt to argue that the Manchester ordinance is not content-neutral.  This is, of course, contrary to the sworn testimony of Shirley Phelps-Roper, who

---

[27] Plaintiffs do cite to *Phelps v. Hamilton*, 840 F. Supp. 1442, 1461 (D. Kan. 1993).  That case, on a point that was never before the appeals court, notes the connection between Westboro Baptist Church (based in Kansas) and the Kansas protest statute but cites no jurisdictional significance arising from this connection and, more importantly, cites no authority whatsoever suggesting that the supposed connection between Westboro and the statute was properly the basis for standing.  *Hamilton* is *sui generis*.

admitted that the ordinance is facially neutral,[28] and Plaintiffs understandably make no reference to this testimony, which is conclusive on this point. Instead, Plaintiffs argue that the Manchester ordinance cannot be content-neutral because it was solely targeted at Plaintiffs. Yet again, Plaintiffs cite no actual authority for the proposition that a legislative enactment that mentions neither speech nor speaker can nevertheless be converted into a content-based restriction as part of a facial challenge.

Under Plaintiffs' presumed scenario, a special class of litigants—the inspirers—would be created. Not only would the person who is claimed "inspiration" for a law be automatically entitled to standing for a facial challenge—even if she were, for example, imprisoned for life and physically incapable of ever challenging the law—she would also be able to claim that the law, while facially neutral as to everyone else, is content-based as to her alone. Unfortunately for Plaintiffs' grandiose plans to reshape constitutional jurisprudence around themselves, in a facial challenge it is the face of the legislation that controls. Here, there is no reasonable dispute that the current version of the Manchester ordinance targets neither speech nor speaker, but rather concerns the manner and place of speech. As such, the ordinance must be treated as content-neutral, just as the Sixth Circuit previously concluded regarding the same legislative language.[29]

**D.    The Current Ordinance Furthers A Significant Governmental Interest.**

Plaintiffs take a scattershot approach to countering the governmental interest argument advanced by Manchester. Echoing the holding of *Strickland*, Manchester showed that it had a significant interest in protecting psychologically vulnerable mourners from intrusions on their privacy rights by unwanted speech. At different points in their brief, Plaintiffs claim that Manchester has offered no objective evidence of trauma suffered by mourners that would justify

---

[28] SPR Dep., p. 80
[29] *Strickland*, 539 F.3d at 361

the limited protections put in place by the ordinance.  However, such evidence is already in the public record.  In *Favish*, the Supreme Court carefully explained the privacy rights of mourners. In *Snyder v. Phelps*, a man won a multi-million dollar jury verdict after asserting that a protest held by Shirley Phelps-Roper and others in her church at his son's funeral caused him emotional distress.[30]  In *Strickland*, the Sixth Circuit logically showed how the rights that were explained in *Favish* also applied—and with greater force—in the different context of funeral protests.

Plaintiffs argue that "[t]here is no evidence that persons who attend public funerals are a captive audience or that they are unable to avoid, if they wish, a small number of people peacefully holding signs on a sidewalk near the location of the funeral."  Manchester does not have to prove that the ordinance is constitutional in every conceivable situation for it to pass constitutional muster.[31]  In any event, Shirley Phelps-Roper made the very same "avert their eyes" argument before the Sixth Circuit, which rejected it in no uncertain terms, stating that "[n]or can funeral attendees simply 'avert their eyes' to avoid exposure to disruptive speech at a funeral or burial service.  The mere presence of a protestor is sufficient to inflict the harm."[32]

Plaintiffs' insistence on objective evidence is groundless, even if the public record were not replete with sufficient evidence to support the governmental interest behind the ordinance.  In the one case cited by Plaintiffs, there was no obvious connection between the challenged restriction and the asserted interest.  Here, the connection is undeniable on a basic, human level. People who are mourning loved ones and dear friends are in pain and are emotionally vulnerable—that is the essential definition of mourning.  The risk of harm to these inherently vulnerable persons from protests directed at the central event of the mourning process—the final

---

[30] 533 F. Supp. 2d 567 (D. Md. 2008), *rev'd by* 580 F.3d 206 (4th Cir. 2009) (citing First Amendment grounds), *cert. granted by* --- S. Ct.---, 2010 WL 757695 (March 8, 2010)
[31] *Strickland*, 539 F.3d at 373, *citing Frisby*, 447 U.S. at 488
[32] *Id.* at 366, *citing Frisby*, 447 U.S. at 478

farewell of the funeral and burial—is immediately evident to anyone with even a scintilla of understanding of the human experience.  Manchester is not required to conduct double-blind psychological experiments on mourners to determine objectively exactly what types of speech are most offensive to them, and only then pass an ordinance.  This is particularly true where, as here, the relationship between the harm and the government action is immediately self-evident.

Plaintiffs also try to use the limited nature of the ordinance against Manchester.  They point out that protestors outside the limited privacy zone could use noise amplification, supposedly negating the purpose of the privacy zone.  The fact that Manchester has calibrated its ordinance so as to balance the significant governmental interest in protecting the privacy rights of mourners with the First Amendment rights of protestors does not weaken the importance of the governmental interest behind the ordinance.  Governments must make choices between apparently conflicting rights every day, and Manchester's ordinance is no different.  Certainly it would be most ideal for the "captive audience" of mourners to have Manchester ban funeral protests outright, but that is not the decision it made.  The fact that Manchester did not go to the utmost extremity to protect mourners has no bearing on whether the ordinance furthers a significant governmental interest.  It certainly is evidence of Manchester's appropriate and laudable solicitude for contrary points of view, one of which Plaintiffs claim to represent.

**E.     The Current Ordinance Is Narrowly Tailored, As Plaintiff Concedes.**

As with the issue of content neutrality, Plaintiffs must fight against the record when attention turns to whether or not the ordinance is narrowly tailored.  Shirley Phelps-Roper testified that the 300-foot fixed privacy zone was not a problem, because she and her fellow church members like to be away from the actual funeral or burial service—even a mile away is

fine.[33]   Plaintiffs try various sorts of linguistic gyrations to escape this testimony, urging that "[a]lthough Plaintiff Shirley Phelps-Roper stated that counter-picketers are **the** target audience, it is clear they are not the exclusive audience."[34]   How it is possible for the counter-protestors to be "the" target audience, clearly denoting exclusivity, and yet not also be "the exclusive audience" is not explained.[35]   In any event, it is indisputable that the 300-foot, fixed privacy zone is not a material impediment to Plaintiffs' attempts to deliver their message to a core audience.

Plaintiffs try to quibble with the affidavit of one of the region's leading funeral home directors, Thomas Kutis, III, that shows the limited effect of the ordinance on protesting activities because of the limited times in which funeral services and burial services are held. They argue that Kutis' affidavit is limited to "traditional" funeral and burial services, not referencing "memorial services".   Plaintiffs provide no support for the alleged divergence between something called a "traditional funeral service" and something else called a "memorial service" that is perforce excluded from the category of "traditional funeral service" and must be addressed separately.[36]   Plaintiffs provide no counter-affidavit to Kutis, and therefore must rely on semantics and invented distinctions to mount even a feeble attack on his testimony.

Plaintiffs actually have very little to say in response to Manchester's arguments that the ordinance is narrowly tailored.   Vexed by their own testimony that treats the 300-foot fixed privacy zone as little more than a nuisance, they rely on word games.   Just as the *Strickland* court found with respect to the same legislative provisions, this Court should rule that the current version of the ordinance is narrowly tailored to serve a significant governmental interest.

---

[33] SPR Dep., pp. 73-74
[34] Plaintiffs' Mem. in Opp., p. 19 (emphasis added)
[35] This bit of wordplay is undermined by the fact that Shirley Phelps-Roper also conceded in the *Strickland* case that the actual funeral attendees were not her primary audience.  539 F.3d at 372
[36] Plaintiffs also refer to visitation services.  By its plain language, the Manchester ordinance does not apply to visitation services, except where they might occur immediately before a funeral at the same site.  A protestor could not remain in front of the site within an hour of the funeral while claiming to merely be protesting the visitation.

**F.     Ample Alternatives To Communicate Are Open, As Previously Conceded.**

Plaintiffs assert that "ample alternatives" are not open to them because their intended audience are the people at the funeral and they can only be reached at the funeral.  This argument is without merit.  First, as discussed immediately above, the funeral attendees are not Plaintiffs' primary audience, as was conceded in both Ohio and here.  Second, if Plaintiffs' argument were to be accepted, the "ample alternatives" prong could never be met whenever protestors claimed that their message could only be delivered in one precise setting—the "accept no substitutes" argument.  But Plaintiffs are not entitled to their best means of communication,[37] and it is not as if funeral attendees exist only for purposes of attending a particular funeral and then otherwise fade into evanescence.  As with everyone else, the attendees can presumably be reached at other times by Plaintiffs' website or by Plaintiffs' appearances on television and radio, which provide more than ample alternative means of communication.[38]

**G.     The Current Ordinance Is Not Overbroad Or Vague.**

The conclusory claim on this point made in Plaintiffs' Response is addressed in Manchester's Memorandum in Opposition to Plaintiffs' Second Motion for Summary Judgment, which is incorporated fully herein by reference.

**H.     Conclusion**.

Plaintiffs have offered no evidence to establish their standing to bring a facial constitutional challenge against any version of Manchester's funeral protest ordinance.  The current version of the ordinance is a narrowly tailored effort to advance a significant governmental interest while leaving open ample avenues for communication.  For all these reasons, Manchester should be granted summary judgment on Plaintiffs' claims.

---

[37] *Strickland*, 539 F.3d at 372.  Shirley Phelps-Roper also stated in her brief in that case that she "'does not claim that funeral protests are her most effective channels of communication.'"  *Id.*
[38] *Id.*

Respectfully submitted,

**LEWIS, RICE & FINGERSH, L.C.**


By:   /s/ Evan Z. Reid
        Neal F. Perryman, #24715
        Evan Z. Reid, #93822

        600 Washington Ave., Suite 2500
        St. Louis, Missouri 63101
        (314) 444-7600
        (314) 241-6056 Facsimile
        nperryman@lewisrice.com
        ereid@lewisrice.com

        and

        Patrick R. Gunn, #23353
        City Attorney
        City of Manchester, Missouri
        11901 Olive Blvd., 3rd Floor
        P.O. Box 419002
        St. Louis, Missouri 63141
        (314) 432-4550
        (314) 432-4489 Facsimile
        prg@gunn-gunn.com

        Attorneys for Defendant
        City of Manchester, Missouri

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was sent via this Court's electronic mail system to counsel of record, this 22nd day of March, 2010.

/s/ Evan Z. Reid